Reyna, Circuit Judge, dissenting.
This is an important case of first impression. I agree with the majority on the important issue of whether the United States Department of Commerce may apply the preferentiality legal standard that has been repealed by Congress. It cannot. I conclude that the use of the repealed standard incurably taints the entirety of the underlying countervailing duty investigation. Thus, I would vacate and remand on this basis.
The majority, however, affirms Commerce's final determination that the Korean government does not extend a countervailable subsidy in its provision of electric power to Korean CORE producers. I dissent from this part of the majority opinion. First, despite Commerce's use of a repealed standard, the majority theorizes that "adequate remuneration" exists because the Korean government purportedly recovers its costs to the extent it avoids bankruptcy. This novel theory is contrary to law and not supported by substantial evidence. Second, the majority affirms the U.S. Court of International Trade's judgment that Nucor failed to exhaust its argument concerning Commerce's decision not to include certain costs in its subsidy analysis, such as the costs of nuclear power generation. The administrative record, however, is replete with evidence that Nucor raised and argued those issues before Commerce. I would reverse the U.S. Court of International Trade and remand to Commerce for its consideration of those costs. For the reasons set out below, I dissent.
I.
Prior to passage of the Uruguay Round Administrative Act ("URAA"), U.S. trade law defined a countervailable subsidy as the provision of goods or services at "preferential rates." 19 U.S.C. § 1677(5)(A)(ii)(II) (1988). Loosely, preferential rates meant treatment more favorable to some than to others. At the start of the Uruguay Round negotiations, the U.S. government adopted as principal negotiating objective the replacement of the "preferentiality" standard with a standard more conducive to U.S. trade objectives. Consequently, as part of the Uruguay Round results package, the preferentiality standard was replaced with a "less than adequate remuneration" standard. URAA, Statement of Administrative Action, H.R. Doc. No. 103-316, vol.1, at 927 (1994) ("SAA"); see 19 U.S.C. § 1677(5)(E)(iv).
*1257 Important to this case is that the SAA makes clear that in the provision of goods or services, the "less than adequate remuneration standard replaces the preferentiality standard."[1] SAA at 927. In Certain Softwood Lumber Products from Canada , Commerce addressed the then relatively new adequate remuneration standard, noting that "the government price must be compared with a market-determined price. It [was] no longer sufficient to say that the government does not discriminate among buyers[;] we must determine whether the government is receiving adequate remuneration, i.e. a market-based price." 66 Fed. Reg. 43,186, 43,196 (Dep't Commerce Aug. 17, 2001) (declaring that there are "important differences between the discarded preferentiality standard and the current adequate remuneration standard" (emphases added)).
More than two decades after Congress repealed the preferentiality standard in countervailing duty law, Commerce resurrects it. At the outset and throughout Commerce's adequate remuneration analysis, Commerce examined whether some or all Korean CORE producers received a preferential price. See J.A. 9023-24, 9025, 9026. The Government argues that Commerce was justified in applying the preferentiality standard because it did so in part only, and because under the facts of this case, it had no other way to reach a decision on whether the Korean CORE producers benefited from countervailable subsidies.[2] Appellee Br. 24-27. These arguments have no merit. Commerce acted "well beyond the bounds of its statutory authority," i.e., contrary to law and the "clear unambiguously expressed intent of Congress," by knowingly applying a repealed legal standard. Util. Air Regulatory Grp. v. EPA , 573 U.S. 302, 326, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) ; see also City of Arlington, Tex. v. FCC , 569 U.S. 290, 297, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (stating that an agency's "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").
I agree with the majority that Commerce improperly relied on the repealed preferentiality standard. For example, the majority rejects the Government's "broad position" that a "preferential rate" analysis is proper under the statute. Maj. Op. 1249-50, 1250-51, 1252-53, 1254-55, 1256. This alone compels vacatur and remand with instructions that Commerce undertake a countervailing duty analysis in view of the entirety of the record before it, applying the less than adequate remuneration standard required by the statute.
*1258 II.
Once preferentiality is discarded, all that remains of Commerce's analysis is a limited technical discussion of how KEPCO distributed costs for the purpose of tariff rate proposals. This cursory cost recovery analysis is insufficient to support the conclusion that the electricity prices paid by Korean CORE producers are consistent with prevailing market conditions and the full value of the assets received.
The majority recognizes that the relevant standard is the adequate remuneration standard, which is focused on whether the Korean CORE producers paid the "full value" of the assets. Maj. Op. 1252-53 (citing Delverde, SrL v. United States , 202 F.3d 1360, 1368, 1370 (Fed. Cir. 2000) (vacating and remanding because "Commerce's methodology for determining whether Delverde received a countervail[able] subsidy [was] invalid as being inconsistent with 19 U.S.C. § 1677(5)")). I agree that is the correct focus, but Commerce focused on something other than "full value" here.
The countervailing duty statute provides that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1667(5)(E)(iv). "Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." Id. Yet Commerce did not determine how KEPCO's tariff schedule reflects prevailing market conditions. Commerce's cost recovery analysis in the Final Determination Memo is a nearly verbatim reproduction of its analysis in the Preliminary Determination Memo .[3] Compare J.A. 8909, with J.A. 9028. This fact calls into question the extent to which Commerce actually considered or verified the evidence produced during the investigation. Cf. CS Wind Vietnam Co. v. United States , 832 F.3d 1367, 1380 (Fed. Cir. 2016) (remanding to Commerce for failure to adequately explain its determination "to ensure that the agency's exercise of power adheres to the authorizing law and respects the record evidence.") In the background section of the opinion, the majority reproduces Commerce's analysis of KEPCO's standard pricing mechanism for setting its tariff rate schedule and simply affirms the negative countervailing duty determination on the basis that Commerce's analysis was sufficient evidence of adequate remuneration. Maj. Op. 1246-47, 1254-55.
The majority's conclusion that Commerce's analysis is reasonable and supported by substantial evidence lacks support both in law and the administrative record. For example, the majority holds that "KEPCO's pricing met familiar standards of cost recovery," but conducts no analysis of Commerce's methodology. Id. at 1254-55. The majority does not explain what "familiar standards of cost recovery" means or how they are consistent with the statutory requirement that price setting be in accordance with prevailing market conditions. The majority constructs a theory that a government's tariff rates necessarily reflect market conditions because tariff rates are intended to recoup costs such that a government authority manages to stay in business. This theory or understanding is inconsistent with the fundamental purpose of U.S. countervailing duty *1259 law. It is also contrary to the record evidence.
The administrative record demonstrates that KEPCO is neither profitable nor that the Korean CORE producers paid the "full value" of the assets sold. As the Korean government explained, it controls the electricity market through majority ownership in KEPCO-solely a transmission and distribution entity-to implement national energy policy and further the public policy goals of the Korean government. J.A. 2543. The record shows that historically, electricity prices in Korea have "maintain[ed] the level lower than total cost"; electricity prices have been "excessively low," including around the period of investigation; and electricity prices have "not offset cost increase factors such as high fuel prices for generation." J.A. 3924. KEPCO's Form 20-F similarly highlights that the lengthy deliberative process required for approving increases in electricity tariffs in Korea may not adjust "to a level sufficient to ensure a fair rate of return" and may not offset "the adverse impact of ... current or potential rises in fuel costs." J.A. 8949. Commerce failed to analyze or even discuss why this evidence is not relevant or persuasive, and the majority similarly fails to do so.
The record also demonstrates that the cost of generating electricity is the most significant cost in the provision of electricity services. See J.A. 8316 (showing cost attributed to generation to be approximately 90% of KEPCO's total cost in its provision of industrial electricity). Yet, as the majority acknowledges, Commerce's "analysis of costs did not include the costs of generating" electricity. Maj. Op. 1247. When generation costs are explicitly not analyzed, it is unreasonable to assume that Commerce's analysis adequately supports the determination that KEPCO's pricing is consistent with prevailing market conditions. Here, substantial evidence in the administrative record demonstrates the opposite. For this reason, I conclude that Commerce's final determination is not supported by substantial evidence.
III.
Relevant to the adequacy of Commerce's cost recovery analysis is its decision not to include in the analysis the cost to generate the electricity sold by KPX to KEPCO. The majority agrees with the Trade Court that Nucor has not exhausted its arguments concerning KPX. Maj. Op. 1255-56. The majority asserts that Nucor mentions KPX only in passing, which was not enough to preserve its related arguments on appeal. Id. The majority faults Nucor for not adequately developing arguments related to KPX in Nucor's case brief, yet Commerce's cost recovery analysis explicitly ignored Nucor's arguments, finding KPX's costs not "relevant." Id. at 1247-48, 1255-56.
Commerce, however, has an affirmative duty to investigate any appearance of a subsidy discovered during investigation. See 19 U.S.C. § 1677d ; Allegheny Ludlum Corp. v. United States , 112 F. Supp. 2d 1141, 1150 (Ct. Int'l Trade 2000) (Wallach, J.). Additionally, the burden of production of evidence related to KPX was not on Nucor, but on the Korean Government as the party in possession of the information. Ta Chen Stainless Steel Pipe, Inc. v. United States , 298 F.3d 1330, 1336 (Fed. Cir. 2002). "[T]he substantial evidence standard requires review of the entire administrative record," necessitating that "we consider both the trade court's prior decisions and [Commerce's] determinations, including 'the evidence presented to and the analysis by [Commerce].' " Nippon Steel Corp. v. United States , 458 F.3d 1345, 1351 (Fed. Cir. 2006). The majority ignores portions of the administrative record, *1260 including the arguments Nucor made in its briefing to Commerce, and abdicates our responsibility to review Commerce's cost recovery analysis on the basis that the majority has "been shown no reversible error." Maj. Op. 1254. The Government has not alleged non-cooperation on the part of Nucor. To the extent that Nucor has the burden to show the existence of a countervailable subsidy, Nucor pointed to the documents it had and made those arguments. Commerce, not Nucor, failed in its duty here.
As the majority acknowledges, Commerce did not request costs of the Korean generators.[4] Maj. Op. 1247-48. These costs would have included costs of generation, such as variable fuel prices and fixed facility construction costs. Commerce determined that only the costs to KEPCO, not the costs of the generators themselves, were relevant to price because KEPCO purchases electricity through KPX, which purchases from the generators. See J.A. 9028.
Nucor argued at length before Commerce why generation costs to KPX were relevant. See J.A. 8953-57. Commerce itself acknowledged in the Final Determination Memo that Nucor argued that "KEPCO's electricity tariff prices are not set in accordance with market principles" because the prices set by KPX do not reflect the "actual costs incurred by the nuclear generators." J.A. 9020. In explaining KPX's role, Nucor described how KEPCO's own Form 20-F explains that the Cost Evaluation Committee determines electricity prices in Korea through a cost-based pool system with fixed (capacity) and variable (marginal) cost components. J.A. 8953-54. The Cost Evaluation Committee is part of KPX. J.A. 911, 2546. Nucor then pointed out that KPX is 100% owned by KEPCO and its subsidiaries, and that KEPCO's Form 20-F also explains that KPX distributes purchase orders among generation units according to the "merit order system" that prioritizes generators with low variable costs, e.g., nuclear generators, irrespective of fixed costs. J.A. 8954.
Nucor also asserted before Commerce that the costs of energy, as determined by KPX's Cost Evaluation Committee, are "vitally important" to determining whether the CORE producers obtain their electricity according to market principles. J.A. 8954-55. Nucor argued that the prices set by KPX "grossly understate" the actual costs of generation for nuclear plants, which provide Korean CORE producers much of their electricity during off-peak hours when demand from other consumers is low, because the Cost Evaluation Committee assigned the same fixed price for "all generation units, regardless of fuel type used." J.A. 8955-56 (quoting KEPCO's Form 20-F (J.A. 2548)). Nucor argued that KPX's price-setting approach shifted the price of electricity away from accurately reflecting the cost of nuclear power generation because it has cheap "fuel" but also has per unit capital expenditures (fixed costs) three times those of thermal generation units. Id. Nucor contended that this approach results in a "gross distortion of electricity prices" for Korean CORE producers, which are among the principal users of nuclear power. Id.
An entity that is a 100%-owned subsidiary of the government is an "authority" under our countervailing duty laws. See 19 U.S.C. § 1677(5)(B) ("[T]he term 'authority'
*1261 means a government of a country or any public entity within the territory of the country." (emphasis added)); cf. , Guangdong Wireking Housewares & Hardware Co. v. United States , 900 F. Supp. 2d 1362, 1376-77 (Ct. Int'l Trade 2013) ("Because the purpose of [countervailing duty] law is to offset the harm to domestic industries caused by foreign subsidies ... it is reasonable for Commerce to attempt to detect and counteract all forms of foreign subsidies .... [including those] which are not provided directly by the government but instead pass through private or quasi-private channels."). Nucor presented both evidence and argument before Commerce that KPX was 100%-owned by KEPCO and that KPX was a public entity with a significant role in the supply of electric power.
The foregoing evidence, argued in detail by Nucor but not considered by Commerce, suggests that KPX and its Cost Evaluation Committee insulate KEPCO and the Korean CORE producers from the actual costs of generation, specifically for nuclear generators, by setting the identical capacity price for all generators, regardless of differing costs to generators of each fuel type. Additionally, KEPCO's Form 20-F states that KPX is a "statutory not-for-profit organization" responsible for setting the price of electricity in Korea. J.A. 2545. Thus, the electricity prices set by KPX in its not-for-profit role are highly relevant to the inquiry of whether the Korean government provides a direct or indirect countervailable subsidy to Korean CORE producers when the government provides the producers electricity. These circumstances undermine the argument or theory that tariff rate schedules necessarily reflect market conditions.
Yet, the majority and the Trade Court find a failure to exhaust on grounds that Nucor did not "meaningful[ly]" argue that KPX was part of the "authority" under § 1677(5)(B) or that "KPX's costs had to be requested and considered." Maj. Op. 1256; see also Nucor Corp. v. United States , 286 F. Supp. 3d 1364, 1375-77 (Ct. Int'l Trade 2018). To the contrary, Nucor's arguments as to the relevance of KPX's costs and its role in providing a subsidy could hardly have been more explicit. Absent expressly using the word "authority" in describing KPX, Nucor did more than enough to raise these issues before Commerce; it made persuasive arguments.
Under these circumstances, the majority imposes nothing more than a mere semantic formality-one that deprives Nucor of its day in court, fails to protect domestic industry from material injury, and constitutes an unreasonable and unjust application of the doctrine of exhaustion. Where "nothing in the record suggests that any additional material from [plaintiff] would have been significant to Commerce's consideration of the issue or to later judicial review," we have held that dismissal for failure to exhaust is inappropriate. Itochu Bldg. Prods. v. United States , 733 F.3d 1140, 1146 (Fed. Cir. 2013) (reversing the Trade Court where Commerce referenced and rejected plaintiff's position in the final decision and "nothing ... hint[ed] at something significant that [plaintiff] could have said but did not."). Such is the case here.
Even if the doctrine of exhaustion reasonably applied, the circumstances here counsel against its application. When determining whether the exhaustion doctrine applies, the court must take into account not only agency interests but also "the interest of the individual in retaining prompt access to a federal judicial forum." Itochu Bldg. , 733 F.3d at 1145 (citing McCarthy v. Madigan, 503 U.S. 140, 145, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ).
*1262 "Courts have recognized several recurring circumstances in which institutional interests are not sufficiently weighty or application of the doctrine would otherwise be unjust," such as (1) if additional filings with the agency would be ineffectual, and (2) if the issue before the court involves a pure question of law that can be addressed without further factual development. Id. at 1146 ; see also Yangzhou Bestpak Gifts & Crafts Co. , Ltd. v. United States , 716 F.3d 1370, 1381 (Fed. Cir. 2013) ("Certain exceptions to the exhaustion requirement apply, such as where exhaustion would be a useless formality, or where the party had no opportunity to raise the issue before the agency." (internal quotation marks omitted)).
The majority demands a useless formality. Nucor does not assert new evidence or new facts on appeal. As discussed above, the record already contains evidence and argument that underlie the obvious conclusion that KPX is part of the relevant authority; no additional filings to establish that fact are needed. Nor can the Government feign surprise by asserting that KPX is an "authority," given the prominence of this issue in the Maverick Tube case. See 273 F. Supp. 3d at 1304-05.
A countervailing duty investigation, like an antidumping duty investigation, is an administrative investigation by a government agency; it is not an adversarial proceeding as is a court action. See NEC Corp. v. United States , 151 F.3d 1361, 1367 (Fed. Cir. 1998) (noting the "investigatory (versus adjudicatory) nature of the antidumping investigation"). Commerce collects information from a number of sources, including the petitioner, respondents, and governments, and bases its determinations on the record before it. Commerce should not be permitted to ignore its own record on the basis that a party "mentioned ... only in passing" what the record loudly proclaims. Maj. Op. 1255-56.
Indeed, 19 U.S.C. § 1671(a) provides that Commerce "shall" impose a countervailing duty if it determines that "any public entity" in a country is providing a subsidy. Allowing Commerce to hide behind the exhaustion doctrine based on a mere formality in this case undermines this statutory purpose of countervailing duty law. See Maj. Op. 1250-51. The Government does not dispute that KPX is a public entity, only whether Nucor referred to it as an "authority." Applying the exhaustion doctrine under these circumstances does not serve its purpose because Commerce "not only has erred but has erred against objection made at the time appropriate under its practice" by making its unreasonable determination that Nucor's arguments regarding KPX were irrelevant. Sandvik Steel Co. v. United States , 164 F.3d 596, 599 (Fed. Cir. 1998). As such, judicial correction is appropriate. For these reasons, I conclude that the Trade Court's application of the exhaustion doctrine was an abuse of discretion. See Itochu Bldg ., 733 F.3d at 1145.
IV.
For the foregoing reasons, I would vacate the judgment of the Trade Court and remand to Commerce for further proceedings.

The SAA is more than mere guidance or explanation. The SAA forms part of the trade agreements package that Congress adopted as law in the passage of the URAA. 19 U.S.C. § 3512(d).

This is not the first time that Commerce used the preferentiality standard post-URAA. Commerce, the Trade Court, and the majority all rely to some extent on Maverick Tube Corp. v. United States , 273 F. Supp. 3d 1293, 1307 (Ct. Int'l Trade 2017). See Maj Op. 1252. Indeed, Commerce's final determination in this case mirrors the final determination in Maverick Tube . But Maverick Tube is not controlling precedent and was not reviewed by this court. In Maverick Tube , the Trade Court affirmed Commerce's interpretation of the countervailing duty statute, holding that the statute permitted continued reliance on the preferentiality standard. E.g., 273 F. Supp. 3d at 1307 ("Commerce's past experience shows that, in certain situations, preferentiality-like tests may be useful when determining the adequacy of remuneration."). The case was appealed to this court and voluntarily dismissed prior to oral argument. But as this court rules in this case, Commerce's reliance on the preferentiality standard is contrary to the statute. See Maj. Op. 1249.

See also Maverick Tube, 273 F. Supp. 3d at 1302 (reviewing Welded Line Pipe From the Republic of Korea: Final Negative Countervailing Duty Determination , 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) ). Commerce's analysis in Maverick Tube is also nearly verbatim to its analysis in this case. See id. at 1309-10.

"Generators" refers to the generation units themselves, including nuclear generation units, which Nucor argued are the predominant source of electricity for Korean CORE producers. J.A. 9028.