Slip Op. No. 24-102

# UNITED STATES COURT OF INTERNATIONAL TRADE

OFFICINE TECNOSIDER SRL,

    *Plaintiff,*

v.

UNITED STATES,

    *Defendant,*

*and*

NUCOR CORPORATION

    *Defendant-Intervenor.*

Before: Stephen Alexander Vaden, Judge

Court No. 1:23-cv-00001 (SAV)

## OPINION

[Remanding Commerce's Remand Determination.]

Dated: September 17, 2024

*Pierce J. Lee*, Crowell & Moring LLP, of Washington, DC, for Plaintiff Officine Technosider Srl. With him on the brief was *Daniel J. Cannistra*.

*Augustus J. Golden*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Tara K. Hogan*, Assistant Director, Commercial Litigation Branch, and *Ashlande Gelin*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Stephanie M. Bell*, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation. With her on the brief were *Alan H. Price, Christopher B. Weld*, and *Jeffrey O. Frank*.

**Vaden, Judge:**   Before the Court is the U.S. Department of Commerce's (Commerce) remand determination for the 2020–21 administrative review of the antidumping order for steel plate from Italy.   At issue is whether Commerce should depart from its normal annual average cost methodology and instead use an alternative quarterly cost methodology for Plaintiff Officine Technosider SRL (Officine).   Commerce sought a voluntary remand to reconsider if it should apply the alternative methodology.   On remand, Commerce compared quarterly trends in sales for the U.S. and home markets with the cost of manufacturing for certain control numbers and determined that using the alternative methodology is warranted. However, all U.S. sales took place in one quarter, making it difficult to decipher a trend for U.S. sales prices.   Only one control number shared between the U.S. and home markets is also among the five highest-selling control numbers in both markets — further complicating Commerce's task.   And a past Commerce decision points to another potential way to analyze the data.   Because Commerce failed to properly respond to these shortcomings, its decision lacks substantial evidentiary support and will be **REMANDED** for further explanation.

## BACKGROUND

### I.        Procedural Background

This case concerns a challenge to Commerce's Final Results in the administrative review of the antidumping order on certain carbon and alloy steel cut-to-length plate from Italy, covering entries from May 1, 2020, through April 30, 2021

(the Period of Review). *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 75,219 (Dep't of Com. Dec. 8, 2022) (Final Results), and accompanying Issues and Decisions Mem. (IDM), J.A. at 2,305, ECF No. 44. At issue is whether Commerce should use its normal annual weighted-average cost methodology for the entire Period of Review or an alternative methodology, which examines costs in shorter periods to minimize potential distortions, known as the quarterly cost methodology.[1] Officine is an Italian producer and exporter of carbon and alloy steel cut-to-length plates. Pl.'s Mot. for J. on Agency R. and Supp. Opening Br. (Pl.'s Mot.) at 6, ECF No. 24. Officine challenged Commerce's Final Results. *See* Compl., ECF No. 11. The Court granted Defendant-Intervenor Nucor Corporation's (Nucor) Consent Motion to Intervene to support Commerce's original determination. Order Granting Intervention, ECF No. 20.

Officine filed its Motion for Judgment on the Agency Record, focusing on Commerce's use of the annual weighted-average cost methodology instead of the quarterly cost methodology. Pl.'s Mot. at 2, ECF No. 24 (identifying five issues, all dealing with the quarterly cost methodology); *see also Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021,*

---

[1] A more detailed explanation of Commerce's test for applying the quarterly cost methodology is found in the Discussion portion of this opinion. *See infra* § I (Legal Framework).

87 Fed. Reg. 34,246 (Dep't of Com. June 6, 2022), and accompanying Prelim. Decision Mem. at 19, J.A. at 2,289, ECF No. 44 ("[W]e determined that our quarterly cost methodology is not warranted ....  Therefore, we applied our standard methodology of using annual average costs ...."); IDM at 31, J.A. at 2,335, ECF No. 44 (continuing to reject requests to use the quarterly cost methodology).  Officine contended that Commerce established a "clear and predictable practice" for when it would employ the quarterly cost methodology; Officine met both criteria for its use; and Commerce failed to explain why it declined to use it.  Pl.'s Mot. at 14, 18–20, 24–25, ECF No. 24. It asked the Court to remand the case for Commerce to reconsider its decision.  *Id.* at 34.

After reviewing Officine's brief, Commerce requested a voluntary remand to "reconsider … application of the quarterly cost methodology … and, if appropriate, revise the dumping margin calculation."  Def.'s Mot. for Voluntary Remand at 2, ECF No. 26 (Def.'s Mot.).  Commerce explained that it examines costs averaged over the entire Period of Review unless there are:  (1) "significant cost variations" and (2) "those variations are linked to changes in sales prices."  *Id.* at 2 (quoting *Rebar Trade Action Coal. v. United States* (*RTAC*), 45 CIT __, 503 F. Supp. 3d. 1295, 1299 (2021)). When these criteria are met, Commerce may apply a quarterly cost methodology.  *Id.* (citing *RTAC*, 45 CIT __, 503 F. Supp. 3d. at 1299).  Commerce believed that an important part of its required analysis was missing from the record and requested the Court allow it to consider anew the information Officine submitted.  *Id.* at 1.  The

Court granted the unopposed Motion on May 15, 2023.  Order Granting Def.'s Mot. for Voluntary Remand (Remand Order), ECF No. 29.

## II.    Commerce's Voluntary Remand and the Present Dispute

Commerce filed its Remand Results on September 12, 2023, and the Parties submitted comments.[2]  Final Results of Redetermination Pursuant to Ct. Remand Order (Remand Results), ECF No. 32; *see* Def.-Int.'s Comments in Opp'n to Remand Results (Def.-Int.'s Br.), ECF No. 38; Def.'s Comments on Remand Results (Def.'s Br.), ECF No. 47.  On remand, Commerce reopened the record and requested that Officine file additional information.  Remand Results at 2, ECF No. 32.  It requested this data to determine if Officine's foreign sales were made below that product's cost of production.  *Id.* at 3.  Commerce then applied the first part of its test, examining whether Officine experienced significant changes in the cost of production over the Period of Review.  *Id.* at 4.  It explained that the difference between the highest and lowest cost of manufacturing during the Period of Review must be at least 25 percent to be a "significant change."  *Id.*  The agency determined that Officine experienced such a change.  *Id.*

Next, Commerce examined whether there were linkages between the cost of manufacturing and sales prices — the second part of its test to determine whether to depart from its standard methodology and consider the data on a quarterly rather

---

[2] Officine filed a letter in lieu of responsive comments fully supporting Commerce's determination.  *See* ECF No. 42.

than yearly basis. *Id.* at 4–5. Commerce "compared weight-averaged U.S. market and [home] market sales prices, by quarter, with the reported quarterly [cost of manufacturing] for high volume [control numbers]."[3] *Id.* at 4. It stated that it used its "standard analysis" to examine two pools consisting of "the five largest sales volume [control numbers] in the home market and five largest sales volume [control numbers] in the U.S. market to determine whether there was a reasonable correlation between changing costs and sales prices from quarter to quarter." *Id.* at 10. Officine's U.S. sales consisted of only five control numbers, and those sales all occurred in the same quarter so that "it was not possible to perform the linkage analysis for the U.S. sales [control numbers]." Draft Remand Calculation Mem. at 2–3, J.A. at 83,020–21, ECF No. 44. Commerce could only compare Officine's sales in its home market of Italy with the cost of manufacturing and look for linkages there. *Id.* at 3, J.A. at 83,021.

Based on this limited data, Commerce concluded that Officine's Italian sales prices and cost of manufacturing showed "a reasonable correlation." Remand Results at 4–5, 10, ECF No. 32; *id.* at 5 n.13 (citing Draft Remand Calculation Mem. at 2–3,

---

[3] "Control number," often referred to by the contraction "CONNUM," denotes a unique product based on relevant physical characteristics. To ensure that Commerce is comparing like products in the home and U.S. markets, it asks respondents to sort merchandise according to key differentiating categories with each number in the product's control number corresponding to physical characteristic groupings particular to the merchandise under review. *Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 45 CIT __, 520 F. Supp. 3d 1314, 1321 n.4 (2021). As a simple shorthand, a reader may substitute "product" any time he reads "control number" or "CONNUM."

J.A. at 83,020–21, ECF No. 44 and Attachment III, J.A. at 83,383, ECF No. 46). It found that the quarterly costs of manufacturing and Italian sales prices "mov[ed] in the same direction for the majority of the [Period of Review]." *Id.* at 10 n.35. Commerce determined, "[T]here is linkage between [Officine's] changing sales prices and [cost of manufacturing] during the [Period of Review]." *Id.* at 5. In other words, as manufacturing costs increased or decreased, the prices Officine charged in Italy did the same. Because Commerce found that Officine's data satisfied both elements of its test, Commerce concluded that it was appropriate to perform its final computations using the alternative quarterly cost methodology. *Id.* Commerce assigned Officine a revised dumping margin of zero percent after applying these methodological revisions — a dramatic decline from 20.44 percent in the original determination. *Compare id.* at 2, *with* Final Results, 87 Fed. Reg. at 75,220.

Commerce's flipped determination has effectively flipped the parties in this case. Although Nucor originally joined this suit as Defendant-Intervenor to help Commerce support its original determination, Nucor now opposes Commerce's remand determination and asks this Court to send it back to Commerce to try again. Nucor objects to Commerce's use of the alternative quarterly cost analysis to examine Officine's data. It contends that Commerce improperly conducted its two-part test to determine if quarterly data should be used. Nucor only contests the second step — the reasonable linkage analysis. Oral Arg. Tr. at 84:17–20, ECF No. 51 (THE COURT: "[Y]ou don't object that the 25 percent threshold has been met? We're only

talking about the linkages?"  MS. BELL:  "That's correct, Your Honor.").  Nucor

argues that Commerce used its "typical approach," but "the agency's rote application"

did not consider "specific facts …, including information that undermines the

reasonableness of the agency's reliance on this approach and ultimate conclusion."

Def.-Int.'s Br. at 4, ECF No. 38.  It first argues that the linkage test is unreliable

because Commerce was unable to analyze U.S. sales and only focused its analysis on

sales in Officine's Italian home market.  *Id.* (citing Draft Remand Calculation Mem.

at 2, J.A. at 83,020, ECF No. 44).  Nucor also argues Commerce's home market

analysis should have focused on those products sold in both the U.S. and Italy — as

opposed to the five largest-selling home market control numbers.  *Id.*; Final

Calculation Mem. at 1, J.A. at 83,396, ECF No. 44.  Because of Commerce's myopic

focus, Nucor asserts "there is evidence of a correlation between cost and price for only

half of the relevant data" — the home market sales  — "and no evidence of a

correlation for the other half" — the U.S. market sales.  Def.-Int.'s Br. at 4, ECF No.

38.  For both these objections, Nucor claims that Commerce failed to "meaningfully

discuss or consider the record before it and how the specific facts of this case support

its cost methodology."  *Id.* at 5.

Commerce responds that it used its "standard practice of examining the top

five selling [control numbers]" in the U.S. and home markets.  Def.'s Br. at 10, ECF

No. 47.  It acknowledges it did not conduct a linkage analysis for the U.S. sales but

contends that it could still find a reasonable linkage between changes in home market

sales prices and changes in the cost of manufacturing. *Id.* at 9–10. Responding to Nucor's objection that Commerce should have analyzed those products that had sales in both the U.S. and Italian markets, Commerce retorts: (1) It relied on its established test for applying the quarterly cost methodology; (2) Nucor's approach is impractical because it requires running the linkage analysis after the margin calculation; and (3) even under Nucor's approach, Commerce could still find reasonable linkages in the home market control numbers that overlap with the U.S. market control numbers. *See id.* at 10–11 (citing Remand Results at 11, ECF No. 32); *id.* at 13 (citing Final Calculation Mem. at 2, J.A. at 83,397, ECF No. 44).

The Court held oral argument on March 27, 2024. ECF No. 49. The parties debated whether Commerce could find a reasonable linkage based on home market sales data alone and if Commerce's explanation is supported by substantial evidence. *See, e.g.*, Oral Arg. Tr. at 25:23–25, 29:17–20, 37:9–14, ECF No. 51. No party identified a prior case or administrative review where Commerce conducted a linkage analysis solely based on quarterly home market data. *Id.* at 14:25–15:11, 50:19–51:8, 52:16–23. The Court also sought to discern how Commerce's linkage analysis works under normal circumstances, *i.e.*, when there are multiple quarters of sales data for control numbers sold in both markets. *Id.* at 6:6–16, 7:6–13 (discussing the linkage analysis in an "optimal situation"). The case is now ripe for decision.

**JURISDICTION AND STANDARD OF REVIEW**

This Court has jurisdiction under 28 U.S.C. § 1581(c), which grants authority to review actions contesting final determinations in antidumping reviews. The Court must set aside Commerce's remand determination if it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i). "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *New Am. Keg v. United States*, 45 CIT __, 2021 Ct. Intl. Trade LEXIS 34, at *15 (Mar. 23, 2021). When reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses if the agency's action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit describes "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Additionally, "results of a redetermination pursuant to court remand are … reviewed for compliance with the … remand order." *Ellwood City Forge Co. v. United States*, 47

CIT __, 2023 Ct. Intl. Trade LEXIS 113, at *7 (July 24, 2023) (internal quotation marks omitted).

## DISCUSSION

At issue is the adequacy of Commerce's explanation for why its standard test for applying a quarterly cost methodology is reliable under nonstandard facts. Commerce normally calculates an annual weighted-average cost for the Period of Review but may apply an alternative quarterly cost methodology if it finds (1) significant changes in the cost of manufacturing during the Period of Review and (2) evidence of linkage between changes in the cost of manufacturing and sales prices. No party disputes that the first criterion is met. Although the quarterly cost methodology may be an established alternative to the expected method, Commerce must explain why the data present here warrant its use. Commerce's rote application of its test to a non-traditional dataset in the face of specific objections from Nucor does not suffice. Commerce did not adequately explain: (1) why focusing solely on Italian sales is a reliable indicator of linkage for U.S. sales, (2) why it chose not to follow its precedent in *Ferrovanadium from Korea* and focus its analysis on products jointly sold in both the Italian and U.S. markets, and (3) how it analyzed the data it did examine to determine there was proper linkage between the cost of manufacturing and the sales price. The Court does not hold — and Nucor does not argue — that Commerce cannot find the necessary linkage exists when there is only one quarter of U.S. sales data. However, Commerce must set forth a new

determination supported by substantial evidence to explain why its test is reliable in this case.

## I. Legal Framework

This case involves antidumping duties, which are imposed on merchandise "sold in the United States at less than its fair value." 19 U.S.C. § 1673(1). Antidumping duties equal "the amount by which the normal value exceeds the export price … for the merchandise." *Id.* § 1673(2)(B). That amount is the "dumping margin." 19 U.S.C. § 1677(35)(A). Normal value is the home market price, and the export price is the U.S. price. *See Nagase & Co. v. United States*, 47 CIT __, 628 F. Supp. 3d 1326, 1331 (2023) (citing *Koyo Seiko Co. v. United States*, 258 F.3d 1340, 1342 (Fed. Cir. 2001)). Commerce calculates normal value "based on home market sales … made 'in the ordinary course of trade.'" *RTAC*, 45 CIT __, 503 F. Supp. 3d. at 1301–02 (quoting 19 U.S.C. § 1677b(a)(1)(B)(i)). However, Commerce disregards home market sales made at prices below the cost of production. *Id.* (citing 19 U.S.C. §§ 1677b(b)(1), 1677(15)(A)). Thus, Commerce needs to determine the cost of production in order to choose appropriate home market sales against which to compare sales in the U.S. market.

The statute sets no time period Commerce must examine to calculate the cost of production and consequently no time period "over which a respondent's various costs must … be averaged." *Pastificio Lucio Garofalo, S.p.A. v. United States*, 35 CIT 630, 633 (2011) (citing 19 U.S.C. § 1677b(b)), *aff'd sub nom. Pastificio Lucio Garofalo,*

*S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012). Commerce's "normal practice is to calculate an annual weighted-average cost for the [Period of Review]." Remand Results at 3, ECF No. 32; *see also* Def.-Int.'s Br. at 3, ECF No. 38. But Commerce may "depart from its normal practice," *RTAC*, 45 CIT __, 503 F. Supp. 3d at 1302, and use "alternative cost averaging period[s]" — usually quarterly — when its normal method "would distort the dumping analysis due to significant cost changes." *See Pastificio*, 35 CIT at 634; *see also* Oral Arg. Tr. at 46:7–9, ECF No. 51 (MR. GOLDEN: "[T]his is a methodology not to determine the dumping margins, but to determine what data gives … the accurate dumping margin.").

Commerce uses the alternative quarterly methodology if (1) there are significant changes in the cost of manufacturing during the Period of Review and (2) "record evidence indicates that sales made during the shorter cost-averaging periods [can] be reasonably linked with [the cost of manufacturing] during the same shorter cost-averaging periods." Remand Results at 3, ECF No 32; *see also* Def.-Int.'s Br. at 3, ECF No. 38. In cases such as here where the Period of Review is twelve months, Commerce has established a set threshold for the changes in the cost of manufacturing to be "significant." The difference between the highest and lowest costs of manufacturing during the Period of Review must be a minimum of 25 percent. Remand Results at 4, ECF No 32 (citing *e.g.*, *Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't of Com. Dec. 11, 2008), and accompanying IDM at cmt. 4). No party

disputes that the significance test is met. Oral Arg. Tr. at 15:18–16:8, 84:17–20, ECF No. 51.

Commerce next analyzes if the changes in sales prices and the cost of manufacturing are "reasonably linked." Remand Results at 4, ECF No 32 (citing *e.g.*, *Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 6,627 (Dep't of Com. Feb. 10, 2010), and accompanying IDM at cmt. 6). Absent a surcharge or similar pricing mechanism that provides a direct linkage, Commerce examines the data to determine if "changes in selling prices reasonably correlate to changes in unit costs." *Certain Welded Carbon Steel Pipe and Tube from Turkey: Notice of Final Results of Antidumping Duty Administrative Review* (*Tube from Turkey*), 76 Fed. Reg. 76,939 (Dep't of Com. Dec. 9, 2011), and accompanying IDM at 4; *see also* Oral Arg. Tr. at 8:3–16, ECF No. 51 (MR. GOLDEN: "[Commerce is] looking for … a linkage, a correlation, something that reasonably shows that sale prices and cost of manufacturing are linked …. [A]re these numbers … trending together …? When [both numbers] go up … do they … seem to go up at about the same rate?"). Commerce examines sales and cost of manufacturing data for two pools of control numbers, *i.e.*, products: the home market and U.S. market. Commerce typically analyzes cost and price trends for the five most frequently sold home market control numbers and the five most frequently sold U.S. control numbers. *Tube from Turkey*, IDM at 4; *see SeAH Steel Corp. v. United States*, 34 CIT 605, 612 (2010) (analyzing quarterly average price and cost changes for the

five largest U.S. and home market control numbers). *But see Ferrovanadium from the Republic of Korea: Final Determination of Sales at Less Than Fair Value* (*Ferrovanadium*), 82 Fed. Reg. 14,874 (Dep't of Com. Mar. 23, 2017), and accompanying IDM at 24 n.109 (identifying Commerce's standard test for using a quarterly cost methodology but deviating when only one control number was sold in the U.S. market).

For each control number, Commerce examines the quarterly average prices and cost of manufacturing for reasonable linkage. *See, e.g.*, *Tube from Turkey*, IDM at 4. Its analysis is holistic. *See Ferrovanadium*, IDM at 25 ("[L]inkage does not require direct traceability between specific sales and their specific production costs, but rather relies on whether there are elements which would indicate a reasonably positive correlation between the underlying costs and the final sales prices charged by a company."). Elements indicating reasonable linkage may include: (1) the relative magnitude of the changes in the price and cost; (2) whether, from quarter-to-quarter, the prices and costs moved in the same direction; and (3) whether the respective slope lines for the quarterly prices and costs consistently trended together. *See id.* Commerce explained at oral argument that, although it examines the entire pool of ten control numbers, it starts the analysis with the control numbers representing the most sales on a dollar-value basis because they are the best indicators of linkage. Oral Arg. Tr. at 13:6–11, ECF No. 51 ("[I]f we see trends in the largest value sales, but [not] … in the smaller control numbers …, Commerce would

not be dissuaded [from finding a reasonable linkage].").  Commerce can also still find

a "reasonable linkage" when an element cuts against doing so.  *See, e.g.*, *Tube from*

*Turkey*, IDM at 4 (noting that the sales price and the cost of pipe did not always trend

together from quarter to quarter but that the magnitude of changes and consistent

slope line trends still indicated reasonable linkage).

Commerce has never addressed if the linkage analysis is reliable when

Commerce can only analyze home market sales.  Oral Arg. Tr. at 14:25–15:13, ECF

No. 51 (admitting that no party cited "a case where [Commerce] was forced to deal

with a situation … where … one of the markets only had one quarter of data"); *id.* at

50:19–51:8, 52:16–23.  And when there is only one quarter of sales data, Commerce

cannot examine normal elements in its linkage analysis such as the magnitude of

price changes quarter-to-quarter, the direction of those changes, or if the slope line

moves in the same direction as costs.  *See* Draft Remand Calculation Mem. at 2–3,

J.A. at 83,020–21, ECF No. 44; Remand Results, *Nucor's Comments*, at 8, ECF No.

32 ("[A] price trend cannot be calculated from a single data point.").  Here there is

only one quarter of U.S. sales data.  The question before the Court is what this means

for Commerce's linkage analysis.  Draft Remand Calculation Mem. at 2–3, J.A. at

83,020–21, ECF No. 44.

## II.     Commerce's Quarterly Cost Methodology Analysis in the Present Case

Nucor challenges Commerce's determination to use its alternative quarterly cost methodology to analyze Officine's data.  Under an optimal situation, Commerce examines two pools of five control numbers each in the home market and U.S. market to determine if there is a reasonable linkage between price and cost of manufacturing. Remand Results at 10, ECF No. 32.  *But see Ferrovanadium*, IDM at 25.  In this case, the U.S. pool contains only one quarter's worth of sales data.   Draft Remand Calculation Mem. at 2–3, J.A. at 83,020–21, ECF No. 44.   Nucor agrees that Commerce followed its typical test but argues that its "rote application here failed to take into account the specific facts of this record, including information that undermines the reasonableness of the agency's reliance on this approach and ultimate conclusion."  Def.-Int.'s Br. at 4, ECF No. 38.  The company raises two objections based on (1) the absence of usable U.S. sales data in the linkage analysis and (2) the limited overlap between U.S. market control numbers and home market control numbers.  *Id.* at 4–5.  The Court takes each objection in turn.

Nucor cites to a past case where Commerce changed its analysis when the data created questions about whether the normal test was appropriate.  *Id.* at 6–7 (discussing *Ferrovanadium*).   In *Ferrovanadium*, a respondent produced three products during the period of review but sold only one in the U.S. market. *Ferrovanadium*, IDM at 24 n.109.  The lone U.S. control number was also the highest

sales volume control number in the home market. *Id.* at 24. Commerce based its linkage analysis on that control number only. *Id.* at 25.[4] It compared quarterly prices and the cost of manufacturing, found a correlation, and determined that there was reasonable linkage. *Id.* The decision did not address whether the other home market control numbers factored into Commerce's analysis, *id.* at 21–26, nor did the decision explain what percentage of sales the one shared control number represented in the home market. *Id.* The decision does say that the one shared product had the largest sales in both markets. *Id.* at 25 n.109.

Nucor maintains that *Ferrovanadium* is relevant to both its objections because Commerce (1) modified its test when faced with a non-standard data set and (2) focused on the overlap between home market and U.S. market control numbers in its linkage analysis — neither of which it did here. Oral Arg. Tr. at 66:14–67:12, ECF No. 51; *see also* Def.-Int.'s Br. at 7, ECF No. 38 ("Commerce considered the specific facts of [*Ferrovanadium*] and took a modified approach to address a unique factual situation. This is what Nucor has asked for, and Commerce has failed to do, here."). The company argues that Commerce's failure to address *Ferrovanadium* and how the non-standard data set may have affected the reliability of the linkage analysis

---

[4] In *Ferrovanadium*, Commerce also conducted the significant cost change analysis based on the single shared control number. *Ferrovanadium*, IDM at 24. Because no party contests Commerce's determination that the significant change test is met, the Court only focuses on the second prong, the reasonable linkage analysis. Oral Arg. Tr. at 15:18–16:8, 84:17–20, ECF No. 51.

renders the determination unsupported by substantial evidence.  Oral Arg. Tr. at 65:5–10, ECF No. 51.

**A.**

Commerce failed to address whether its usual linkage test remains reliable here, whether the absence of usable U.S. market data undermines its determination, and whether this case warrants a non-standard methodology, as in *Ferrovanadium*. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given ....").  The substantial evidence standard requires that Commerce "articulate [a] rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  Further, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp.*, 340 U.S. at 488.  Nucor does not contend that Commerce can never conduct a linkage analysis using only home market quarterly data.  Oral Arg. Tr. at 60:10–14, ECF No. 51; *id.* at 21–24  (THE COURT: "You haven't made the strong form argument [that Commerce] can never do that. You've just said, here, I'm not convinced; where's your explanation?"  MS. BELL: "Correct, Your Honor.").  Instead, it attacks the adequacy of Commerce's explanation. Remand Results at 10–11, ECF No. 32 ("Nucor further argues that Commerce is unable to conduct a trend analysis given that [Officine] only made U.S. sales during

the third quarter of the [Period of Review] and thus, none of the [control numbers] sold in the U.S. support a finding of linkage between costs and prices.").

First, Commerce repeatedly argues that it used its "standard" practice to determine that the quarterly cost methodology is warranted. *See, e.g.*, Remand Results at 10, ECF No. 32. This is misleading. Commerce's normal practice is to examine the data over the entire period of review. *Id.* at 3. Officine is asking for an *exception* from the normal methodology so that the data can be examined quarterly instead of annually. Second, Commerce has failed to explain why it is confident that its test shows reasonable linkage between the cost of manufacturing and sales prices in both the home market *and* U.S. market when it only analyzed home market data. Commerce ideally examines cost of manufacturing and sales data from ten control numbers — five from the U.S. market and five from the home market — for multiple quarters, giving more weight to higher sales volume control numbers. *Id.* at 10, ECF No. 32; Oral Arg. Tr. at 13:6–11, ECF No. 51. No party has identified a prior case where Commerce found a reasonable linkage based solely on home market sales data. Oral Arg. Tr. at 14:25–15:13, 50:19–51:8, 52:16–23, ECF No. 51 (acknowledging this to be the case). Thus, Commerce cannot claim it has used its standard methodology when it has failed to analyze the home market data as part of its analysis.

When asked where Commerce addressed the absence of U.S. sales data, counsel directed the Court to this passage:

> We also find that, while *Commerce may not be able to complete a trend analysis for U.S. prices* due to the timing of [Officine's] sales, *this limitation is not dispositive* in light of the affirmative evidence of linkage between costs and prices in the home market. *Moreover, it is not that there is no correlation regarding the U.S. prices, but rather that the data points we have do not allow us to perform the analysis.* Commerce analyzes the data points of the top five [control numbers] in the comparison and U.S. markets, in accordance with our practice, to the extent that the data points are available.

Remand Results at 12, ECF No. 32 (emphasis added); *see also* Oral Arg. Tr. at 75:10–22, ECF No. 51. The cited passage merely states that (1) Commerce could not complete a trend analysis for U.S. prices, (2) this fact is "not dispositive" given other linkages in the home market data, and (3) Commerce will use the normal ten control number approach "to the extent that the data points are available." Remand Results at 12, ECF No. 32. Commerce's nod to Nucor's objection — that the lack of data is "not dispositive" — fails to explain why the absence of data apparently analyzed by Commerce in every other application of its test does not undermine the results. *Cf.* Def.-Int.'s Br. at 3, ECF No. 38. It fails to link the "facts found" with the "choice made." *See Burlington Truck Lines*, 371 U.S. at 168.

Commerce also points to data and documents found in the record and asks the Court to trust the agency that it has examined the data and determined the results were reliable. *See* Oral Arg. Tr. at 32:13–34:11, ECF No. 51 (drawing the Court's attention to information in Officine's supplemental questionnaire); *id.* at 35:9–11 (MR. GOLDEN: "[T]he data Commerce uses, and the data in the record — and this may sound ridiculous — is the next approximately 350 pages …. It starts on [J.A.

at] 83,024."); *id.* at 38:3–5 (MR. GOLDEN:  "[T]he Decision Memorandum cites to these documents, and these documents contain the mathematics and the code and the data.").  But "[t]he Court reviews answers Commerce actually gave for substantial evidentiary support."  *Bonney Forge Corp. v. United States*, 46 CIT __, 560 F. Supp. 3d 1303, 1312 (2022); *see* 19 U.S.C. § 1516a(b)(1)(B)(i).  "It does not draft answers Commerce never gave from the available record information before the Department." *Bonney Forge*, 36 CIT ___, 560 F. Supp. 3d at 1312; *accord Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given."). Commerce may not state its conclusion, cite reams of data without explanation, and say "Trust us.  We're right."  By doing so, the agency creates a textbook example of failing to "articulate [a] rational connection between the facts found and the choice made."  *Burlington Truck Lines*, 371 U.S. at 168.  Likewise, where an explanation is provided at oral argument but not in the agency's actual decision, it cannot be considered.  *Compare* Oral Arg. Tr. at 54:24–55:22 (Officine's counsel asserting that Commerce addressed nonstandard factual datasets in Officine's prior reviews but admitting that those prior reviews are neither on the record nor discussed in the Remand Results), *with Burlington Truck Lines*, 371 U.S. at 168 ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action[.]").

Commerce has also failed to address why it opted to use its typical test here when it deviated in *Ferrovanadium*.  The Government argues that *Ferrovanadium* is

distinguishable because it involved multiple quarters of sales data in both markets — albeit with a smaller pool of control numbers. Oral Arg. Tr. at 75:10–22, ECF No. 51; *see also* Remand Results at 12, ECF No. 32 ("Commerce still followed its established practice in [*Ferrovanadium*] of analyzing the largest sales volume [control numbers] in the pool …; the pool simply happened to be a pool of one [control number] …."). But that explanation is both mistaken and beside the point.

Commerce's claim that there "simply happened to be a pool of one" control number in *Ferrovanadium* is incorrect. Remand Results at 12, ECF No. 32. The *Ferrovanadium* respondent produced three total control numbers — two sold exclusively in the home market and one sold in both the home and U.S. markets. *Id.* at 11–12. Despite there being three total control numbers, Commerce focused solely on the control number shared between both markets for its linkage analysis. *Id.* Thus, as Nucor notes, faced with a non-standard data set, Commerce deviated from its test and focused on the one product sold in both markets. Here, Commerce has done the opposite. Faced with another non-standard data set, it ignored the limited U.S. market data entirely and made its conclusion based solely on data from the Italian home market. Despite never having done that before, Commerce claims it is merely following its normal methodology, so all is well. Unfortunately for Commerce, it is not.

If Commerce wishes to continue applying the quarterly methodology, it must explain (1) why it believes home market sales data alone allows it to render a

conclusion about whether sales prices are reasonably linked to the cost of production, (2) why it believes ignoring U.S. market data is or is not a departure from past practice, and (3) why whatever test it applies can be trusted to produce reliable results. Because Commerce failed to answer any of these questions or acknowledge that its analysis deviated from its normal methodology, its decision is unsupported by substantial evidence and must be **REMANDED**.

**B.**

In a final attempt to save its determination from being remanded, Commerce asks the Court to consider its alternative holding where Commerce claims that, even if it applied Nucor's preferred analysis, the result would be the same. *See id.* at 8 (summarizing Nucor's argument that "Commerce's linkage analysis should … focus on the home market [control numbers] that matched to U.S. sales in the margin calculations.").[5] Commerce claims it would still find the necessary linkage to allow

---

[5] The parties bracketed information identifying (1) the number of overlapping control numbers between the U.S. and Italian markets (three), (2) the number of control numbers sold in the U.S. market that also appear in the top five highest-selling Italian market control numbers (one), and (3) the number of overlapping control numbers for which Commerce could find a linkage under Nucor's proposal to consider *all* overlapping control numbers between the two markets (two out of three). *See, e.g.*, Final Calculation Mem. at 1–2, J.A. at 83,396–97, ECF No. 47. However, the parties waived any confidentiality claim by referring to these facts in open court. *Compare CVB, Inc. v. United States*, 48 CIT __, 681 F. Supp. 3d 1314, 1317–19 (2024) (refusing to redact information for similar reasons), *with* Fed. Cir. R. 25.1(c)(1) ("Material will lose its status … if and when it … has appeared in a filing without being marked confidential."), Oral Arg. Tr. at 24:4–7, ECF No. 51 (the Court summarizing Nucor's argument that Commerce should primarily care about control number "A" instead of examining the top five highest-selling control numbers); *id.* at 23:24–24:1 (Officine's counsel stating that three U.S. control numbers were also sold in the home market); *id.* at 24:12–16

it to use the quarterly cost methodology instead of reviewing the data on an annual basis. Because Commerce's alternative suffers from the same flaw as its primary finding — lack of an adequate explanation on the record — the Court cannot sustain Commerce's determination on this alternative ground.

Commerce examined the five highest-selling control numbers in the home market and the U.S. market.[6] *Id.* at 10. Officine's home market sales consisted of more than five control numbers, but Commerce limited its review to the five highest-selling control numbers. *Compare* Officine Suppl. Questionnaire Resp., Ex. RD-3, J.A. at 83,015, ECF No. 44 (identifying the universe of Officine's home market control numbers)*, with* Attachment III, J.A. at 83,383, ECF No. 46 (comparing changes in sale price and manufacturing cost for the five highest-selling home market control numbers). Nucor argues that Commerce should focus its analysis on three overlapping control numbers — present in both the home market and U.S. market — which the Court referred to at oral argument as control numbers "A," "B," and "C." Def.-Int.'s Br. at 4, ECF No. 38; Oral Arg Tr. at 5:8–23, 23:24–24:4, ECF No. 51; Final Calculation Mem. at 2, J.A. at 83,397, ECF No. 44. Control number "A" is the only control number sold in both the Italian and U.S. markets that is also among the five

---

(Officine's counsel stating that Commerce looked at all three overlapping control numbers and found a reasonable linkage for the majority).

[6] The U.S. market only has five control numbers; thus, the pool of U.S. control numbers consists of all U.S. market control numbers. *See* Officine Suppl. Questionnaire Resp., Ex. RD-3, J.A. at 83,016, ECF No. 44 (identifying the universe of Officine's U.S. market control numbers).

largest-selling Italian market control numbers. Def.-Int.'s Br. at 4, ECF No. 38 ("[O]nly one of the five largest-selling home market [control numbers is relevant] to the margin calculation, making Commerce's analysis of the five largest-selling home market [control numbers] of limited value."); Oral Arg. Tr. at 24:4–7, ECF No. 51. Control numbers "B" and "C" are sold in both the U.S. and Italian markets but are not among the top five sales volume control numbers in Italy. Nucor notes that Commerce limited its review in *Ferrovanadium* to the single, shared control number and disregarded home market control numbers not also sold in the U.S. market. Def.-Int.'s Br. at 6–7, ECF No. 38.

Commerce responds that, even under Nucor's approach, it "still would find that Nucor's analysis is questionable" because it could find sufficient evidence of linkage for two of the three overlapping control numbers Nucor identified. Final Calculation Mem. at 2, J.A. at 83,397, ECF No. 44; Oral Arg. Tr. at 24:14–15, ECF No. 51 (MR. LEE: "Commerce looked at all three [shared control numbers]. And for a majority of those[,] Commerce found a correlation."). Commerce asserts that, although control number "B" does not support finding linkage, the two other overlapping control numbers — "A" and "C" — together match to a large majority of U.S. sales and demonstrate linkage in the majority of the quarters during the Period of Review. Final Calculation Mem. at 2, J.A. at 83,397, ECF No. 44; *see also* Oral Arg. Tr. at 24:12–16, 45:7–11, ECF No. 51. Although Commerce acknowledges that it *could* deviate from its "normal" approach and look at only the overlapping control numbers,

Commerce *declined* to do so because deviation is inconsistent with its normal linkage analysis. Remand Results at 11, ECF No. 32 (stating that Nucor's approach is impractical because it requires analyzing linkages after running the margin calculation).

Merely identifying a fallback argument cannot save Commerce. If Commerce believes there is more than one way to look at the data, it must state the alternatives, explain how it analyzes the available data, and offer a reasoned explanation. Should Commerce wish to rest a future determination on an analysis of the overlapping control numbers, it needs to state what potential flaws caused it to abandon its "normal" linkage analysis, explain how *Ferrovanadium* informs its decision, and describe how any alternative analysis leads to trustworthy results. Because those explanations are not found in the Issues and Decisions Memorandum, the Court may not sustain Commerce's determination on this alternative basis.

## CONCLUSION

Commerce chose to deviate from its normal practice of using an annual weighted-average cost methodology and instead used a quarterly cost methodology to analyze sales during the Period of Review. Although its test for applying the quarterly cost methodology may be based on past practice, this case presents an atypical data set. Commerce failed to explain why its test for applying a quarterly cost methodology is adequate to address a situation where there is only one quarter of U.S. sales data. It may not ignore an objection without a reasoned explanation

because "an agency's statement of what it 'normally' does or has done before … is not, by itself, an explanation of 'why its methodology comports with the statute.'" *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (quoting *SKF USA Inc. v. United States*, 263 F.3d 1369, 1383 (Fed. Cir. 2001)).

Once it found itself in court, Commerce gave many potential answers and cited hundreds of pages of exhibits. But the necessary analysis and explanation linking that information to Commerce's decision are absent in the Remand Results. Because it is only explanations contained within the Remand Results that count, the Court **REMANDS** this matter for further consideration by Commerce. On remand, Commerce may reopen the record to accept evidence from past reviews, provide further explanation to bolster its current analysis, or choose an alternative pathway in the vein of *Ferrovanadium*. Whichever options Commerce selects, it should link the facts it has found to the choices it makes to explain why the results of its linkage analysis engender confidence. Accordingly, it is hereby:

**ORDERED** that the Remand Results are **REMANDED** to Commerce for further explanation consistent with this opinion. It is further:

**ORDERED** that Commerce shall conduct a new analysis to determine if use of its quarterly cost methodology is warranted;

**ORDERED** that Commerce shall file its Remand Determination with the Court within 120 days of today's date;

**ORDERED** that Defendant-Intervenor shall have 30 days from the filing of the Remand Results to file its brief;

**ORDERED** that Defendant shall have 30 days from the date of Defendant-Intervenor's filing to submit a response;

**ORDERED** that Plaintiff shall have 21 days from the date of Defendant's filing to submit its response; and

**ORDERED** that Defendant-Intervenor shall have 14 days from the date of Plaintiff's filing to submit any reply; it is also

**ORDERED** that Plaintiff shall have 14 days from the date that Defendant-Intervenor submits its reply to file the Joint Appendix. Motions for Oral Argument, if any, shall be due 21 days after the filing of the Defendant-Intervenor's reply.

**SO ORDERED.**

_____
Stephen Alexander Vaden, Judge

Dated: _September 17, 2024_
New York, New York